CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

APR 24 2008

JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BELMONT PARTNERS, LLC, ) | CASE NO. 3:07CV00032 |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | REPORT AND RECOMMENDATION |
| MOHAMAD T. NEHMEH, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | By: B. WAUGH CRIGLER |
| ) | U.S. MAGISTRATE JUDGE |

This action is before the undersigned in accordance with an Order of reference entered by the presiding District Judge directing the undersigned to conduct proceedings and to render a Report setting forth recommendations for the disposition of the plaintiff's February 4, 2008 motion for default judgment as to defendants Mohamad T. Nehmeh ("Nehmeh") and Mario Pino ("Pino"), both as to their liability and damages, if any should be awarded. Even though both defendants were in default and entitled to no additional notice, the undersigned directed that copies of the March 25, 2008 Order setting an evidentiary hearing on the issues referred be forwarded to Nehmeh and Pino.[1] The Order contained both notice of the proceedings and a warning concerning the effects of their failure to attend. On April 15, 2008, an evidentiary proceeding was held, at which time the undersigned received both testimonial and documentary evidence, and as a result thereof, the undersigned reports the following.

## BACKGROUND

**PROCEDURAL**

Plaintiff filed its Complaint on July 9, 2007, naming, as defendants, Mohamad T.

---

[1] Both Nehmeh and Pino failed to formerly acknowledge receipt of the Court's notice of hearing and neither attended the hearing.

Nehmeh, Robert Harrison, Mario Pino, Holly Katsaros, and Ricardo Arrioja (collectively "defendants"). (Dkt. No. 1.) Plaintiff set forth the following claims in its nine-count Complaint: breach of contract against Nehmeh, defamation against defendants, defamation *per se* against Pino, fraud against Nehmeh, conversion against defendants, tortious interference against defendants, statutory conspiracy against defendants, conspiracy against defendants, and injunctive relief and constructive trust against defendants. (Dkt. No. 1, pp. 6-13.) Neither Nehmeh nor Pino filed an Answer to the Complaint. The Clerk entered default against Nehmeh, Pino, and Arrioja on January 30, 2008. (Dkt. No. 14.) The next day, Harrison and Katsaros were dismissed without prejudice as the result of plaintiff's failure to execute service of process on them within the period allowed under Federal Rule of Civile Procedure 4(m). On February 4, 2008, plaintiff moved for entry of default judgment against Nehmeh and Pino, two of the three remaining defendants.

By Order dated March 25, 2008, the presiding District Judge referred this case to the undersigned. (Dkt. No. 17.) An evidentiary hearing was held on April 15, 2008, at which time plaintiff, by counsel, informed the court it was not seeking dispositive action at this time against Arrioja.[2] Plaintiff also informed the court it had elected to pursue only those claims set forth in Count I (breach of contract) against Nehmeh; Count V (conversion) and Count VI (tortious interference) against both Nehmeh and Pino, jointly and severally; and that portion of Count IX seeking injunctive relief against Nehmeh and Pino.

**FACTUAL**

William B. Barnes, Chief Operating Officer and Chief Compliance Officer of Belmont

---

[2]Counsel for plaintiff informed the court that they are actively engaged in determining whether the Ricardo Arrioja who was served in this case actually was the person involved in this case, as the person who was served apparently disputes involvement in the underlying circumstances leading to this action.

2

Partners, LLC ("Belmont" or "plaintiff"), testified that Belmont was an international consulting firm whose principle business was purchasing shell public corporations and, then, brokering a reverse merger which effectively allowed a private company to become publicly traded. He stated that, essentially, there were three ways a company could become a publically traded entity: It could engage in direct registration with the Securities and Exchange Commission ("SEC"); it could register a shell and engage in an initial public offering ("IPO") being underwritten by an investment bank; or it could purchase a defunct publicly traded corporation with little or no assets and potentially some debt, and then, replace the board of directors of the public company with that of the private company leaving a publicly traded entity controlled by the former private investors. It is the last of the three types of transactions in which Belmont engages, namely brokering the sale of shell publicly companies into which formerly private enterprises may then be absorbed. The shell companies typically are traded on one of the over-the-counter ("OTC") markets which are registered with the SEC. According to Barnes, OTC markets have four components, which are rated according to the level of regulatory filing requirements. Companies facing the most stringent filing requirements, thus the "most public," are found on the NASDAQ, then, in order of regulatory requirements, the OTC Bulletin Board, the OTC Pink Sheets and, finally, the OTC Grey Sheets which, according to Barnes, are "almost private."

Belmont's inventory, so to speak, is shell public companies, one of which was Distributed Power, Inc. "(Distributed Power"). Barnes testified that Pino initially approached plaintiff to purchase Distributed Power, which was a non-reporting company and was of the Pink Sheet class. Its registration required no public disclosures other than filing a Form 8-K with the SEC, but there could be no trading in the stock by any proposed purchasers until the company was transferred from plaintiff to a purchaser, and the board of directors was replaced with those chosen

3

by the purchaser. In other words, plaintiff simply sold the shell. Regulations prohibited any efforts by any person to publically market stock until the reverse merger was complete and the appropriate Form 8-K was filed.

Pino and plaintiff reached an agreed price of $250,000.00 for the sale and purchase of the shell company, but before the sale could be closed, Pino attempted to market the stock in violation of SEC rules and regulations. This conduct caused plaintiff to "back out" of the proposed deal, and because of his conduct, plaintiff would not allow Pino to participate in any further efforts to acquire Distributed Power. Pino then secured a substitute purchaser, his purported attorney, Nehmeh, who was to act as sponsor of the purchase. It was represented that Pino would have nothing to with the transaction.[3]

On September 26, 2006, Nehmeh and plaintiff entered into an Agreement For the Purchase Of Common Stock of Distributed Power ("Purchase Agreement") for a purchase price of $250,000.00. (Plaintiff's Exhibit 1, p. 1.)[4] Nehmeh was to pay $100,000.00 cash at closing and was to be the maker of a Promissory Note ("Note") for the balance of the purchase price of $150,000.00, payable in equal installments of $50,000.00 with unpaid principal at an interest rate of 18% per annum. (Plaintiff's Exhibit 1, pp. 1, 8.) The payments were due on or before October 26, 2006, November 25, 2006 and December 25, 2006. (Plaintiff's Exhibit 1, p. 8.) The Purchase Agreement also provided additional compensation to Belmont in the form of acquisition of 5% of the post-merger stock which was not to be diluted for one year. (Plaintiff's Exhibit, 1, p. 1.)

As a form of security for the maker's performance, Section 11 of the Note provided

---

[3] A sponsor buys the shell, merges the private company into the public company, and provides the bridge and permanent financing for same.

[4] All exhibits referred to herein were intorduced by plaintiff and received by the undersigned during the evidentiary hearing on April 15, 2008.

4

that, in the event of default, plaintiff could elect to purchase all the shares, up to One Billion common shares, of the reconstituted company at a price of $0.000001 per share, or $1,000. (Plaintiff's Exhibit 1, p. 11.) If such election was made, plaintiff was to have "no other recourse against the Maker, under this Note or otherwise." (*Id.*) The $100,000.00 down payment was made at closing, but Nehmeh paid only $25,000.00 more before defaulting on the balance of $125,000.00 under the Note.

According to Barnes, Nehmeh was in default from the date the very first installment was due. While he did pay $25,000.00 on November 28, 2006, plaintiff's efforts to contact him by telephone, e-mail and letter were unsuccessful in securing a response. More than that, Barnes related to the court a continued course of conduct by Nehmeh and Pino which essentially frustrated plaintiff's efforts to exercise its election to repurchase the One Billion shares, a repossession if you will, as well as its efforts to resell the repossessed company. Barnes related that Nehmeh never cashed the $1,000.00 check plaintiff tendered for the One Billion shares of common stock under Section 11 of the Note, nor were the shares, in turn, ever tendered by Nehmeh.

According to Barnes, this significantly interfered with plaintiff's ability to mitigate its losses by essentially repossessing the company and selling it to another purchaser because the transfer agent would not permit registration of the company's shares with plaintiff until plaintiff could prove entitlement to such registration. Moreover, Pino re-entered the picture in what Barnes described as an internet-based "pump and dump" e-mail spam scheme actually utilizing plaintiff's e-mail address to promote the sale of stock which neither Pino nor Nehmeh had a right to market. (Plaintiff's Exhibits 5-8.) In fact, the spam scheme became so notorious that it was labeled the leading "pump and dump" scam by the SEC.

At some expense of time and money to plaintiff, and with the cooperation from a joint

5

venturer with Pino and Nehmeh, plaintiff was able to secure clearance from the transfer agent, register the stock, and resell the company to another purchaser. This was so despite the ever-present risk that the transaction would not be closed because of havoc the spam-scam was wreaking in the market and on the regulators. The new purchaser, Global Pay Solutions, paid $200,000.00 for the shell and granted plaintiff an undiluted 5% equity position in the new company.

Barnes related that Nehmeh's refusal to honor plaintiff's election to repurchase the stock under Section 11 of the Note, and the spam scheme initiated by both Nehmeh and Pino, diminished the value of the shell company by $50,000.00 from the $250,000.00 purchase price originally agreed to by Pino when he was involved and by Nehmeh when he purchased the company. Moreover, Barnes related that plaintiff was caused to incur out-of-pocket expenses of $4,305.97 for attorneys and $5,949.06 for in-house personnel in clearing the stock for resale and $14,671.23 in lost interest on the Note. (Plaintiff's Exhibit 8.) The diminished value of the company, lost interest, and plaintiff's out-of-pocket losses totaling $74,926.26, all of which Barnes testified resulted from Nehmeh's breach in delaying transfer of the outstanding shares in Distributed Power back to plaintiff and from the spam "blight" created by both Nehmeh and Pino which left essentially a "clouded title" on the company's stock.

## CLAIMS

In summation, counsel for the plaintiff sought default judgment on Count I (breach of contract), Count V (conversion), Count VI (tortious interference), and that portion of Count IX seeking an injunction to restrain Nehmeh and Pino from continuing to interfere with or making claims related to ownership of or interests in Distributed Power, Global Pay Solutions, or their

6

successors.[5] Plaintiff seeks an award of $74,926.26 in compensatory and $125,000.00 in punitive damages as a result of what plaintiff believes was the wilful, reckless and malicious conduct of Nehmeh and Pino in wrongfully exercising, assuming authority over and depriving Belmont of its shares of Distributed Power (conversion) and for its intentional interference with plaintiff's business expectancies and contractual relationships with Global Pay Solutions.

## APPLICABLE LAW, FINDINGS AND CONCLUSIONS

## DEFAULT JUDGMENT GENERALLY

Though disfavored, default judgment is appropriate when a defendant has failed to respond to or otherwise defend the action, and the decision to enter default judgment lies largely in the sound discretion of the court. *Tazco, Inc. v. Director, Office of Workers Compensation Programs, U.S. Dept. of Labor*, 895 F. 2d 949, 950 (4th Cir. 1990); *Broglie v. Mackay-Smith*, 75 F.R.D. 739, 742 (W.D.Va. July 19, 1977). When default occurs, the court is to take all well-pleaded allegations in the complaint as true, and need not make findings and conclusions, but may be required to conduct a hearing on damages where they are not for a sum certain. *Fair Housing of Marin v. Combs*, 285 F. 3d 899, 906 (9th Cir. 2002); *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979); *Duncan v. GE Consumer Finance, Inc.*, 2007 WL 3275152, at *1 (W.D. Va. November 5, 2007).

The presiding District Judge has referred the case, where Nehmeh and Pino clearly and woefully are in default, for evidentiary proceedings as to both liability and damages. Thus, the court has the benefit of both allegations and evidence upon which to decide the plaintiff's motion for default judgment.

---

[5]Plaintiff did not pursue that portion of Count IX seeking the imposition of a constructive trust.

**COUNT I**

In order to recover damages under the Purchase Agreement and Note, plaintiff must demonstrate a breach of contract which was not remedied by plaintiff's election under Section 11 of the Note to acquire all the outstanding shares for $1,000.00. As mentioned, Section 11 provided that if plaintiff elected to purchase the outstanding stock upon default in payment under the Note, it would have "no other recourse against the Maker, under this Note or otherwise." Plaintiff has proved beyond question that Nehmeh did not honor its election under Section 11 to transfer the stock upon tender to the agreed price and, instead, engaged in a course of conduct, along with Pino, to frustrate those efforts. Nehmeh breached his contract with plaintiff by doing so. While the undersigned is of the view that Nehmeh's default in these proceedings constitutes a waiver of any affirmative defenses he otherwise could have asserted with respect to whether plaintiff had elected its "recourse," his own breach deprives him of the ability to rely on the "no other recourse" provision in Section 11.

Thus, it is RECOMMENDED that default judgment be granted in favor of plaintiff and against Nehmeh under Count I.

**COUNT V**

In order to recover on its claim against Nehmeh and Pino for conversion under Count V, plaintiff must show they wrongfully assumed or exercised the right of ownership over goods or chattels belonging to plaintiff in denial of or inconsistent with its rights. *See Economopoulos v. Kolaitis*, 259 Va. 806, 814 (2000). Again, without question, plaintiff has established that Nehmeh and Pino, as principals and as aiders and abettors of one another, wrongly assumed or exercised the right of ownership over the Distributed Power stock, causing it to be withheld from retransfer and actively and intentionally interfering with plaintiff's efforts to exercise its election to receive

8

the stock. This conduct ranged from Nehmeh's failure to honor plaintiff's demands to retransfer the stock to Pino's making false claims about the activity of Distributed Power and the availability of its stock on the market. Independent of this, the evidence shows Nehmeh and Pino collaborated to wrongfully appropriate and wrongfully exercise use of plaintiff's e-mail account to engage in what became notorious to the SEC as a "pump and dump" scam using "spam" e-mail falsely identified with plaintiff. This independent action caused plaintiff to incur expenses in securing registration and resale of the company's stock and contributed to the loss on the original sale to Nehmeh.

Thus, the undersigned RECOMMENDS that default judgment be granted in favor of the plaintiff and against both Nehmeh and Pino, jointly and severally, on Count V.

**COUNT VI**

In order to recover on its claim for intentional interference with its contractual rights or business expectancies, plaintiff must prove: (1) it had a valid contract expectancy with a third party; (2) there was a reasonable probability of future economic benefit to plaintiff from that expectancy; (3) defendants knew of the expectancy; (4) defendants used improper means to interfere with that expectancy; (5) defendants interfered with that expectancy; (6) it was reasonably certain that the expectancy would have continued but for the defendants' conduct; and (7) that the interference with the contract expectancy was the proximate cause of damage to plaintiff. VMJI, Inst. No. 40.200; *T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan LLC*, 385 F.3d 836, 844 (4th Cir. 2004).

The undersigned finds that plaintiff had a reasonable business expectancy to regain the stock in Distributed Power and resell the company to another purchaser. The evidence shows that plaintiff entered into a valid contract with Global Pay Solutions to purchase the company for a

9

reduced price of $200,000.00 which, but for the improper methods employed by Nehmeh and Pino, such as using plaintiff's own e-mail account to create spam in an effort to "pump and dump" the stock for their own gain, would have enjoyed a value of $250,000.00, the price contracted with Nehmeh for purchase of the company. As a direct and proximate result of Nehmeh and Pino's conduct, plaintiff was caused to incur additional out-of-pocket expenses in an effort to consummate the transaction with Global Pay Solutions and to avoid a loss of the sale altogether.

Thus, the undersigned RECOMMENDS that default judgment be granted in favor of plaintiff and against both Nehmeh and Pino, jointly and severally, on Count VI.

**COMPENSATORY DAMAGES**

Plaintiff has produced evidence which demonstrates that it suffered a loss of $50,000.00 on the valuation of Distributed Power and $24,926.26 in out-of-pocket and carrying costs as direct and proximate result of Nehmeh's breach of the Note and the tortious conduct of both Nehmeh and Pino. It is RECOMMENDED that plaintiff have and recover compensatory damages against Nehmeh, under Count I and against Nehmeh and Pino, jointly and severally under Count V and Count VI in the amount of $74,926.26.

**PUNITIVE DAMAGES**

In order to recover punitive damages against Nehmeh and Pino, or both, plaintiff must show that they acted with actual malice or under circumstances amounting to a willful and wanton disregard of plaintiff's rights. *See* VMJI, Inst. No. 9.080; *Woods v. Mendez*, 574 S.E.2d 263, 268 (Va. 2003). Actual malice is defined as a sinister or corrupt motive such as hatred, spite, ill will, or desire to injure the plaintiff. *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227 (Va. 1981). Should punitive damages be awarded, then the amount awarded must be reasonable and should take into account such things as the duration and reprehensibility of the conduct, the profitability

of the defendants' conduct and the desirability for removing any profit, the financial position of the defendants, and the existence of any other civil remedies against the defendants. *See Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1417-1418 (4th Cir. 1992).

If all that plaintiff's evidence showed was that Pino and Nehmeh intended to acquire Distributed Power without fully paying all the purchase price, there essentially would be no basis to support an award of punitive damages. However, the circumstances presented in Barnes' testimony reveals a concerted plan of action taken by both Nehmeh and Pino that had only their interests in mind at the expense of both plaintiff and potential investors among the general public. The plan hatched when Pino attempted to purchase Distributed Power from plaintiff and immediately began engaging in conduct violating regulatory restrictions on marketing the stock before the sale was consummated. When confronted, Pino then essentially dished the deal to Nehmeh, who purportedly was Pino's attorney. It was represented that Nehmeh would effectuate the transaction, independent of Pino, and in a manner complying with the applicable SEC regulations. The evidence is contrary to those representations.

While the down payment for the company was paid by Nehmeh, plaintiff struggled to receive any of the $150,000.00 balance owed under the Note. Plaintiff's requests to honor contractual obligations, including its election to repurchase the stock under Section 11 of the Note, went unanswered by Nehmeh. In the meantime, interests in the company were being marketed to potential investors, such as Robert Harrison, under circumstances which were engineered by both Nehmeh and Pino. The most egregious of those circumstances was the appropriation of plaintiff's website as a platform from which spam was sent out falsely portraying the activities of Distributed Power in an effort to solicit investors when, in fact, plaintiff was attempting to repossess the company. This scheme was labeled a "pump and dump" scam by the SEC, and it continued during

11

the due diligence period in the resale to Global Pay Solutions, all along threatening the transaction and causing plaintiff additional expenses.[6]

The inference the undersigned draws from the uncontroverted evidence before the court is that both Nehmeh and Pino were at the heart of these tortious activities, which were independent of Nehmeh's breach of the Promissory Note. Their course of conduct could no better demonstrate a sinister or corrupt motive, not only to disregard plaintiff's rights and to injure the company, but also to scam innocent investors by marketing phantom interests in Distributed Power for a "pumped up" value based on false information about the company. This evidence demonstrates Pino and Nehmeh desired to injure plaintiff and others while soliciting investor capital in a company they no longer could claim an interest in owning or controlling.

The undersigned finds the conduct of Pino and Nehmeh was malicious and amounted to a willful and wanton disregard of plaintiff's rights and RECOMMENDS that the presiding District Judge award punitive damages. In fixing the amount of punitive damages, the undersigned agrees with the proffer made by plaintiff's counsel that $125,000.00 represents a figure the defendants are able to pay, because that is what Nehmeh, as well as Pino before him, had agreed to pay for the purchase of Distributed Power on a deferred basis. The duration and severity of Pino's and Nehmeh conduct, of course, may be considered relative, but it is clear that their wrongful activities were intense enough to become notorious at the SEC as a "pump and dump" scam and drive down the value of Distributed Power to potential buyers.

The undersigned RECOMMENDS the presiding District Judge award $125,000.00 in punitive damages against Nehmeh and Pino, jointly and severally.

---

[6]The attitude of these men about the effects of their conduct is reflected in the language Pino chose to use in e-mail communications concerning the transactions which is too foul to repeat in this opinion. (Plaintiff's Exhibit 6, p. 1.)

## INJUNCTION

Injunctive relief, which is equitable in nature, should not be granted where a monetary award is sufficient to compensate the plaintiff for any loss suffered as the result of wrongful conduct by a defendant. *See Christopher Phelps & Associates, LLC v. Galloway*, 492 S.E.2d 532, 543 (4th Cir. 2007) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). In addition to compensatory damages, the undersigned is recommending an award of punitive damages, one purpose for which is to deter any similar future conduct by Nehmeh and Pino. Thus, the question becomes whether injunctive relief is appropriate under these circumstances.

One thing leads the undersigned to believe that the award of both compensatory and punitive damages will not sufficiently protect plaintiff against future claims of ownership or control by Nehmeh or Pino, or both, over Distributed Power or its successors, including Global Pay Solutions. That one thing is the ease with which the internet allows persons, like Pino and Nehmeh, to disseminate to a wide audience claims of ownership or controlling interests in a company. Here, the evidence shows the claims and exercise of ownership were false, fraudulent and made for the sinister reasons set forth above. Monetary relief never could completely provide any real protection against similar future conduct, which under the circumstances presented here, the undersigned finds is capable of repetition with the key stroke on a computer. Not that an injunction will insure against such eventuality, but it will serve as a further needed deterrent to Nehmeh and Pino.

Accordingly, the undersigned RECOMMENDS that the court ENJOIN Nehmeh and Pino from making any claim of or attempting to exercise ownership rights or control over Distributed Power and its successors, including Global Pay Solutions.

## SUMMARY

For the reasons set forth above, it is RECOMMENDED, that the presiding District Judge enter an Order GRANTING plaintiff's motion for default judgment against Nehmeh and Pino and awarding plaintiff compensatory damages in the amount of $74,926.26 and punitive damages in the amount of $125,000.00. The undersigned further RECOMMENDS that the presiding District Judge enter an Order enjoining Nehmeh and Pino from making any claims or attempting to exercise ownership rights or control over Distributed Power and its successors, including Global Pay Solutions.

The Clerk is directed to immediately transmit the record in this case to the presiding United States District Judge. Pursuant to Rule 72(b), parties are entitled to note objections, if any they may have, to this Report and Recommendation within (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. Moreover, the defendants, Nehmeh and Pino hereby are advised that their default may have affected whether their objections, if any, will be entertained by the court.

The Clerk is directed to send a certified copy of this Order to all counsel of record; Ricardo Arrioja at 1308 Tulip Circle, McAllen, Texas 78504; Mohamad T. Nehmeh at 19061 Milford Circle, Huntington Beach, California 92846; and Mario Pino at 6630 North 48th Street, Paradise Valley, Arizona 85253.

ENTERED: _____
U.S. Magistrate Judge

April 24, 2008
Date